## M. B. PURVIS *v.*CITY OF LITTLE ROCK, ARKANSAS, LA QUINTA MOTOR INNS, INC., WORTHEN BANK AND TRUST COMPANY, N.A.

83-184                                                667 S.W.2d 936

Supreme Court of Arkansas
Opinion delivered March 26, 1984
[Supplemental Opinion on Denial of Rehearing June 4, 1984.*]

*Harkey, Walmsley, Belew & Blankenship,* for appellant.

*669 S.W.2d 900. Also, HOLLINGSWORTH, J., opinion on disqualification.

*Rose Law Firm, A Professional Association,* by: *George E. Campbell, Vincent Foster, Jr.,* and *Judy B. Proctor,* for appellee, La Quinta.

*Wright, Lindsey & Jennings,* for appellee, Worthen Bank & Trust Co., N.A.

JOHN I. PURTLE, Justice. The Pulaski County Chancery Court declared that the City of Little Rock properly authorized the issuance of $4,000,000 in "tourism bonds" to be used to finance construction of a La Quinta Motor Inn. In the decree the trial court upheld Act 380 of 1971.

On appeal it is urged that Act 380 of 1971 is governed by Amendment 49 to the Constitution of the State of Arkansas and that it was error for the court not to require Act 380 to be so controlled. Also, it is argued that Act 380, the Tourism Act, did not authorize the issuance of tax free revenue bonds to a private entity for construction of a free standing motel such as the La Quinta Inn. We hold that Act 380 is controlled by Amendment 49. Therefore, those provisions of the Act which authorize the issuance of bonds without an election, interest above 6% and maturity dates beyond 30 years are invalid.

The City of Little Rock issued tax exempt bonds in the amount of $4,000,000 for use in construction of a La Quinta Inn at the intersection of Fair Park Boulevard and the Wilbur D. Mills Freeway, across from War Memorial Park and the Zoo. The bonds were issued pursuant to Act 380 of 1971 and are known as "tourism bonds."

This name attached because the General Assembly defined the tourist business in Arkansas to be an "industry" pursuant to Amendment 49 of the Constitution of the State of Arkansas.

The city actually purchased the property for construction of the motel and leased it to La Quinta for a period of years. Although no taxes will be due on the property the parties agreed that La Quinta would make a payment in lieu of taxes. The bonds are described as limited obligation bonds of the City of Little Rock. They are backed by a letter of credit from Crocker National Bank of San Francisco.

The letter of credit expires after 10 years. Payment of the bonds and interest is to be made exclusively from revenues generated by La Quinta on the leased premises.

The same question was before us in *Purvis* v. *Hubbell, Mayor,* 273 Ark. 330, 620 S.W.2d 282 (1981) when we gave notice of our intention to reconsider our stand on the issue "at the next opportunity after the present opinion becomes final." We also stated:

> After carefully considering our previous decisions, it appears there has been a gradual expansion of the concept of revenue producing bonds, which require no popular approval, as was authorized for instance in (cite omitted).

The next opportunity has arrived. The *Purvis I* decision was handed down on July 13, 1981, and rehearing denied on September 21, 1981. The bonds in the present case are dated May 1, 1982. It is obvious from the language used in that decision that we were trying to give a warning that revenue bonds were probably being used for purposes other than the public purposes contemplated by Amendment 49 and Act 380 of 1971 and that bonds were being approved without holding elections as required by the law and the Constitution.

The Arkansas General Assembly stated that Act 380 was in implementation of Amendment 49 and was necessary for the full accomplishment of the public purposes contemplated by the people in adopting the Amendment. The Act legislatively determined that "tourism" was an industry within the meaning of Amendment 49. As stated by the Amendment, bonds issued pursuant thereto are "for the purpose of securing and developing industry within or near the said municipality holding the election . . ." The legislature has the authority to implement a constitutional amendment. *Rockefeller, Governor* v. *Hogue,* 244 Ark. 1029, 429 S.W.2d 85 (1968). Legislation implementing a constitutional amendment must be consistent with and not repugnant to the constitutional provision being implemented. *Myhand* v. *Erwin, County Judge,* 231 Ark. 444, 330 S.W.2d 68 (1959).

Because of the importance of this case we find it appropriate to review our prior cases and other sources of authority on this subject.

The Arkansas Constitution of 1874, Article 12, Section 4 provides:

> No municipal corporation shall be authorized to pass any law contrary to the general laws of the state; nor levy any tax on real or personal property to a greater extent, in one year, than five mills on the dollar of the assessed value of the same . . .

Article 12, Section 4, was amended by Amendment 10 which was approved by the people of Arkansas in the 1924 general election and declared adopted by a special supreme court in *Brickhouse* v. *Hill*, 167 Ark. 513, 268 S.W. 865 (1925). This Amendment added three paragraphs to Section 4 of Article 12. The thrust of Amendment 10 was to limit the fiscal affairs of counties, cities and towns. The provision of Amendment 10 which we consider here states:

> Nor shall any city council . . . enter into any contract or make any allowance for any purpose whatsoever or authorize the issuance of any contract . . . or other evidence of indebtedness in excess of the revenue for such city or town for the current fiscal year . . .

Article 16 of the Constitution is pertinent to the case before us. It states in part:

> Neither the State nor any city, county, town or other municipality in this State, shall ever lend its credit for any purpose whatever; nor shall any county, city, town or municipality ever issue any interest-bearing evidences of indebtedness . . .

Article 16, Section 1, was amended by Amendment 13, adopted by the people of Arkansas in 1926. Prior to amendment, Article 16 contained only the first paragraph of the text which appears in volume 1, Ark. Stat. Ann. (1947). The portions of the Amendment we are concerned with read:

Provided that cities of the first and second class may issue by and with the consent of a majority of the qualified electors of said municipality voting on the question at an election held for the purpose, bonds in sums and for the purposes approved by such majority at such election as follows: . . .

For the purchase of rights of way for construction of public streets . . . for the purchase . . . and improvement of public parks . . . sewers and comfort stations . . . fire fighting apparatus . . . street cleaning . . . equipment of city halls, auditoriums, prisons, libraries, hospitals . . . garbage disposal plants . . . viaducts . . . bridges . . . for the purpose of purchasing, extending, improving, enlarging, building, or construction of water works or light plants . . .

No bonds issued under the authority of this amendment shall bear a greater rate of interest than six per cent per annum . . .

Said bonds shall be serial, maturing annually after three years from date of issue . . . and no bonds . . . shall be issued . . . for a longer period than thirty five years.

Amendment 49 was adopted by the people of Arkansas in 1958. Section 1 of Amendment 49 states:

Any city of the first or second class, any incorporated town, and any county, may issue, by and with the consent of the majority of the qualified electors . . . voting on the question at an election held for the purpose, bonds in sums approved by such majority . . . for the purpose of securing and developing industry . . .

The Amendment contains other provisions limiting the interest rate to six percent (6%) per annum and limiting such bonds to a period of no longer than thirty (30) years maturity.

Act 9 of 1960 was enacted for the stated purpose of

implementing Amendment 49. This Act allows counties and cities to issue industrial revenue bonds without an election. Act 380 of 1971 was also enacted for the stated purpose of implementing Amendment 49. The main thrust of Act 380 was to legislatively determine tourism to be included for the purpose of securing and developing industry as intended by Amendment 49.

No provision of the Constitution nor any amendment expressly provides for the issuance of any type of bond without an election. Both Act 9 of 1960 and Act 380 of 1971 are based upon Amendment 49. This Amendment simply does not provide for bonds of any kind to be issued without approval of a majority of the qualified electors voting in an election held for that purpose.

Revenue bonds were first mentioned by this court in the case of *McCutchen* v. *Siloam Springs*, 185 Ark. 846, 49 S.W.2d 1037 (1932).

However, the bonds in the *McCutchen* case were issued by an improvement district and had been retired from revenues generated by the electric plant by the time the suit was filed. The city had taken over the operation of an electric generating plant which was owned by the improvement district. The suit actually involved a contract for expansion and improvement at the plant. The costs, which were to be paid over a period of 5 years, were to come from revenues generated by the plant. The allegation was that payments over a period of years violated Amendment 10 which prohibits cities from obligating revenues in excess of the current year. It was held that Amendment 10 did not prohibit this multi-year contract because the city incurred no liability since the funds were payable from revenue income from the electric generating plant. There was no election held on the contract.

Acts 131 and 132 of 1933 authorized municipal water works to issue revenue bonds without an election. These Acts were tested in the case of *Jernigan* v. *Harris*, 187 Ark. 705, 62 S.W.2d 5 (1933). Although certain parts of these Acts were declared unconstitutional, other sections were held to

be valid. The court clearly approved revenue bonds in the language which follows:

> A single answer will dispose of both objections. The municipality, as such, does not incur any obligation on account of the bond issues, nor does it assume any responsibility for their payment, nor can payment be enforced out of taxes or other municipal revenues. It is provided in each act that the bonds to be issued shall be payable solely from the revenues of the proposed systems, the waterworks, in one case, the sewer system, in the other, and that such bonds shall not, in any event, constitute an indebtedness of such municipality within the meaning of the constitutional provisions or limitations, and that it shall be plainly stated on the face of each bond that the same has been issued under the provisions of the respective acts and do not constitute an indebtedness of such municipality within any constitutional or statutory limitation.

The court specifically held the revenue bonds did not violate Amendment 10 and that Amendment 13 had no application here.

Act 131 of 1933 was again upheld in the case of *Snodgrass* v. *Pocahontas,* 189 Ark. 819, 75 S.W.2d 223 (1934). The *Snodgrass* court stated that it was the manifest intention of the framers of Amendment 13 to prohibit cities and towns from issuing interest-bearing evidences of indebtedness for which the people or their property would be taxed. The court stated: "It was not the intention to prohibit cities and towns from making improvements and pledging the revenue from the improvements so made alone to the payment of the indebtedness." Therefore, the revenue bonds issued by the city to pay for improvement of the water works system were approved.

This court has approved a line of cases going back at least to the 1932 case of *McCutchen* v. *Siloam Springs,* supra, which hold that municipalities may issue pure revenue bonds for purely essential public purposes without holding an election. Such bonds are not prohibited by the Consti-

tution and were expressly provided for by the General Assembly. We reaffirm these cases. Several cases have arisen pursuant to the provisions of Amendment 49 and acts of the legislature. The cases of *Myhand* v. *Erwin,* supra, and *Wayland* v. *Snapp,* 232 Ark. 57, 334 S.W.2d 633 (1960), relied upon by appellees, upheld bond issues for which an election had been held. They are not apposite to the question before us. The bonds in the present case were not approved by the electorate. In *Purvis I* we considered so-called revenue bonds which were to be retired primarily from revenues generated by the hotel. However, other sources for bond retirement were present in the case. In any event we issued our caveat and we are now reconsidering the matter of bonds issued without an election.

We were wrong in *Purvis I* where we approved the issuance of revenue bonds pursuant to Act 380 and Amendment 49. However, we did give notice that the matter would be reconsidered at the first opportunity. We expressed serious doubt about bonds being issued without an election. We find no provision of Amendment 49 which allows bonds to be issued without an election. Neither is authorization granted to issue bonds for a period longer than 30 years or at an interest rate greater than 6%.

It was proper for the General Assembly to legislatively determine tourism to be included as an industry as contemplated by Amendment 49. Having so determined, it was not within the authority of the General Assembly to expand the provisions of Amendment 49 to provide for the issuance of revenue bonds without an election. The bonds were not issued for a purely public purpose such as those enumerated in Article 16, after Amendment 13 was approved, and which are set out above in this opinion. Neither were they issued pursuant to Acts 132 or 133 of 1933.

Neither Amendment 49 nor any other constitutional provision permits the issuance of bonds by municipalities without an election. Therefore, Act 380 of 1971 is invalid when it purports to allow bonds to be issued without an election and for interest in excess of 6% and maturity dates beyond 30 years.

We stated in *Purvis I* that we would reconsider our position on revenue bonds issued by municipalities at the next opportunity. The opinion was final on September 21, 1981. The bond issue before us is dated May 1, 1982. There was time enough for our caveat to have been considered. The city may technically be the title owner of the property where the motel is located but neither it nor any of its agencies operates the La Quinta Inn. No public purpose such as those enumerated in Article 16 and Amendment 13 to the Constitution of Arkansas is being served. No election was held. Therefore, the bonds are not valid.

Reversed.

HICKMAN, J., and DUDLEY, J. concur.

ADKISSON, C.J.; HAYS, J. and HOLLINGSWORTH, J. dissent.

DARRELL HICKMAN, Justice, concurring (substituted concurrence). I agree with the majority opinion, which is to hold, among other things, that so-called revenue bonds issued pursuant to Act 380 and Act 9 are illegal unless approved by the voters. But I would go further than the majority and hold that "revenue" bonds by any name or certificates of indebtedness, whether pursuant to Act 9 or Act 380 or any other provision, are unconstitutional unless the bond issue is approved by the voters, because that is what the constitution requires.

First, we should examine what the City of Little Rock did in this case. Little Rock bought land and issued bonds to finance the building of a motel which was totally unconnected with any public enterprise such as a convention center or park. Why? The appellees contend it was done to aid tourism, which we can concede for argument to be a public endeavor, just as industry has been found to be a legitimate public purpose, because the people so found when they adopted Amendment 49 to our Constitution. The bonds in this case are tax-free — that is, the holders do not have to pay state or federal taxes on the interest earned. The bonds will be retired from the rent paid by the motel; when

that is done, La Quinta may buy the land and motel for $100.00.

We expressed deep concern with such schemes when we decided *Purvis* v. *Hubbell,* 273 Ark. 330, 620 S.W.2d 282 (1981). In that case it was argued that the bonds were legal for two reasons: (1) they were issued for a public purpose because a convention center was being built with the money, and (2) the bonds were purely "revenue bonds," to be retired by income made by the center, not paid with taxes or general revenue resources of the city. That was not the case, but the majority found that the bond issue did not have to be approved by the voters as constitutionally required.

In *Purvis* we issued this clear warning:  '

> After carefully considering our previous decisions, it appears there has been a gradual expansion of the concept of revenue producing bonds, which require no popular approval, as was authorized for instance in *Snodgrass* v. *Pocahontas,* 189 Ark. 819, 75 S.W.2d 223 (1934). However, a change should not be made retroactively, after public agencies and investors have relied on our decisions; but in other instances we have given notice that *an interpretation of the Constitution may or will be changed. Clubb* v. *State,* 230 Ark. 688, 326 S.W.2d 816 (1959); *Hare* v. *General Contract Purchase Corp.,* 220 Ark. 601, 249 S.W.2d 973 (1952). Accordingly, we give notice of our intention to prospectively reconsider our cases at the next opportunity after the present opinion becomes final. (Italics supplied.)

The warning has been ignored, as most warnings are. While the specific question is "revenue bonds," the overall question is government indebtedness and the wide-spread abuse of government credit through bonds. We have in this case a bond issue which merely uses the city as a tool to obtain favorable financing for a purely private endeavor. How did we get to this point in Arkansas? The answer is gradually.

The indebtedness of government has always been a sore

subject with taxpayers, because they have to pay the debt — not the "government," not those who govern, not those who conceive the endeavor, not those who incur the debt, nor those who benefit from it directly or indirectly. Bonded indebtedness, as well as long-term indebtedness, is the subject of strict and explicit constitutional provisions. These provisions, as well as the Revenue Stabilization Act 750 of 1973, as amended, are matters of pride to state officials as well as to the people of this state, although the pride is false. Article 16 and Amendment 13 of the Arkansas Constitution (1874) deal with state and local finance and taxation. The first sentence of both states:

> Neither the State nor any city, county, town or other municipality in this State, shall ever lend its credit for any purpose whatever. . . .

Section 1 of Article 16 contemplates that local governments will have to incur some indebtedness for capital improvements and authorizes the issuance of bonds for those purposes. Those purposes are for every conceivable public work: streets, parks, sewer systems, water works, electrical systems, fire stations, libraries, airports, and a host of others.

In 1928 article 16 section 1 was amended by Amendment 13 to provide for constructing, widening, or straightening streets within the corporate limits, constructing flying fields, and comfort stations, purchasing of fire fighting apparatus and fire alarm systems, street cleaning apparatus, public abattoirs, and incinerators or garbage disposals. Ordinary indebtedness is explicitly controlled. The constitution reads:

> The fiscal affairs of counties, cities and incorporated towns shall be conducted on a sound financial basis, and no county court or levying board or agent of any county shall make or authorize any contract or make any allowance for any purpose whatsoever in excess of the revenue from all sources for the fiscal year in which said contract or allowance is made. (Ark. Const. Art. 12 § 4 (1874) as amended by Amendment 10.)

Amendment 20 governs state bonds and requires an election. It says:

> The State shall issue *no* bonds or *other evidence of indebtedness* pledging the faith and credit of the State *or any of its revenues for any purpose whatsoever,* unless approved by the voters. (Italics supplied.)

These provisions direct that the state, counties and cities must live within their means; they can borrow money through a bond issue for explicit public purposes with one important condition — *the public must approve the debt by a vote.* These provisions have often proved to be a roadblock to governors, legislators, builders, bond salesmen, lawyers, county judges, and mayors who conceive and approve of certain public projects but have difficulty obtaining the approval of voters. The terms and conditions imposed on bond issues have also been troublesome. So, virtually all capital expenditures, state and local, are done through the use of revenue bonds without voter approval.

There is no mention in the constitution of revenue bonds, or any bonds for that matter except those approved by voters. The concept of revenue bonds was first approved during the great depression in a series of cases. *McCutchen* v. *Siloam Springs,* 185 Ark. 846, 49 S.W.2d 1037 (1932); *Jernigan* v. *Harris.* 187 Ark. 705, 62 S.W.2d 5 (1933); *Snodgrass* v. *The City of Pocahontas,* 189 Ark. 819, 75 S.W.2d 223 (1934). These cases hold that bonds can be legal even though there is no vote; that since the people would not be taxed or their property appropriated to pay for the indebtedness, there was no violation of Amendment 13. But the court, in its avoidance of the constitution, made one serious mistake. For example, in the *Snodgrass* case, the court chose to call the fees used to pay the waterworks bonds "rentals," which is nothing but a euphemism for taxes. It was reasoned that since the waterworks collected money from the users, that money would retire the bonds, instead of general revenues and, thereby, the waterworks would pay for itself. That completely overlooks the fact that the city imposes the water tax or use fee and orders the taxpayer to pay the bonds. It is simply a backdoor approach. The

ordinary or at least the intended way that cities pay general obligations is to use money collected by ordinance from users of municipal services. The use of revenue bonds is simply a scheme to avoid the legal way a city can borrow money.

Regardless, *Snodgrass* became the precedent for innumerable revenue bonds which did not have to be approved by a vote. That method, rather than issuing constitutional bonds, has become the norm for the obvious reason that voter approval is not required. The use of revenue bonds was and is today, in many instances, used for legitimate public purposes involving sound and needed public improvements. But the practice of issuing revenue bonds without a vote is a serious fault in the government process because there is no check by those who have to pay for the improvement on whether the decision of those to issue the bonds is sound, whether the project is needed and whether, indeed, there is corruption involved in the process.

While in the early history of the use of revenue bonds and even recently elections were held, it has become obvious that the current practice is to avoid submitting to the voters the question of whether the so-called revenue bonds should be approved. The state, in a series of revenue bond issues, has avoided the constitution and issued bonds to build the Justice Building, the Revenue Building, and numerous college and university buildings. See *McArthur* v. *Small-wood*, 225 Ark. 328, 281 S.W.2d 428 (1955); *Holmes* v. *Cheney*, 234 Ark. 503, 352 S.W.2d 943 (1962); *Miles* v. *Gordon*, 234 Ark. 525, 353 S.W.2d 157 (1962). The revenue bonds in *Smallwood* get part of their "revenue" from a biannual appropriation directly from the legislature for "rent" to various state departments and agencies in the Justice Building, which in turn pay off the bonds. In 1982 that rent was over $175,000. The Justice Building and other buildings are being paid for out of general revenues, the so-called "revenue bonds" being retired just as though they were general obligations of the state. Such a practice is unconstitutional because this long term indebtedness was not approved by the voters in a valid election. In the case of university buildings, the students or others are supposed to

pay the bonds with rent or fees; and the Revenue Building bonds are paid in part by fees and charges. The state is, in several current instances, charging itself rent on its own buildings. Over a period of twenty-four years, twenty-four million dollars in bonds have been issued in connection with the University of Arkansas. Some are obviously more sound than others, but none have been approved by the voters to my knowledge.

The scheme for building the Multi-Agency Complex, a state office building, was first begun as part of a grandiose plan, which still exists, to issue seventy-two million dollars in bonds for construction of an extensive office complex immediately west of the Capitol Building. This was done through an agency called the Public Building Authority created by Act 236 of 1973. There was no voter approval for these bonds. The Public Building Authority bonds were declared unconstitutional in lower court. While the case was being appealed, the power of the Public Building Authority to issue bonds was repealed, and the court declared the issue moot. Act 270 of 1975. *Morgan* v. *Sparks & Bryant,* 258 Ark. 273, 523 S.W.2d 926 (1975). At the very next session of the legislature, however, the program was kept alive by Act 713 of 1975, which renamed the Public Building Authority the State Building Services. Part of the Multi-Agency Complex (the "Big Mac Building") was built, which is a less expensive part of the original scheme, from appropriated funds. However, the authority remains for the legislature to approve bonds for that original scheme. Act 1223 of 1975. The legislature is charging its own agencies rent in this new building, an illegal practice, to be placed in a separate fund, for what purpose I do not know. State Building Services has become the legislature's own private bonding authority for illegal appropriations to pay bonds and certificates of indebtedness.

I cannot say for certain how many outstanding bonds exist for other state buildings, university buildings or property in general. (See Act 469 of 1965, Arkansas State Department of Health Building Commission; Act 399 of 1953, Department of Parks and Tourism; Act 186 of 1963, Arkansas Board of Mental Retardation.) Nor do I expect the

executive and legislative branches of the state government will collect and publish just how many such bonds are outstanding. Recently, in the case of *Wells* v. *Clinton,* 282 Ark. 20, 666 S.W.2d 684 (1984), we examined, in part, the question of certificates of indebtedness which could amount to a twenty-five million dollar debt by the State of Arkansas. The state in this case is simply borrowing from itself, pledging revenues to pay it back. It is significant that we did not reach the question of the constitutionality of these certificates. We did hold that it was not an unlawful delegation of authority for certain decisions to be made in connection with those certificates, but we did not approve the certificates. The revenue used to pay off the certificates of indebtedness is in part from fees and in part from revenues produced by the Arkansas Department of Correction. I think part is being paid by interest from state money on deposit, but that is not clear. See Act 458 of 1983 and Act 12 of 1965. This latest scheme is a sleight of hand that permits the state to borrow from money collected for one purpose to be used for another. The state is simply issuing itself an IOU. It is deficit financing prohibited by our constitution. These are pledges of revenues of the State of Arkansas to pay a debt in violation of Amendment 20 to the Arkansas Constitution, which reads:

> [T]he State of Arkansas shall issue no bonds or other evidence of indebtedness pledging the faith and credit of the State or any of its revenues for any purpose whatsoever, except by and with the consent of the majority of the qualified electors of the State voting on the question at a general election or at a special election called for that purpose.

Voters are undoubtedly not aware of these debt obligations. These bonds and certificates are all paid for with funds that should be in the state's treasury for general appropriations. State revenue bonds, just as those issued in this case by the City of Little Rock, state on their face they are not general obligations, but "revenue bonds" to be paid for by the revenue generated. But in reality, if the bonded indebtedness encounters difficulty, the legislature simply pays it — a debt it denies it owes. See Act 907 of 1983.

What we have is a proliferation of public buildings and projects which belong to the State of Arkansas and are being paid for by the State of Arkansas out of general revenues or out of special taxes or fees under schemes designed to avoid the Constitution of Arkansas.

The problem of revenue bonds with local governments took a different turn. The main deviation occurred after World War II when it became evident that if our state was to progress we had to attract industry. The people readily approved Amendment 49 to the constitution, which, for the first time, would allow the state and local governments to issue bonds to promote private industry. Amendment 49 was needed to amend Amendment 13 which spelled out all the various public works for which cities and counties could issue bonds. *Myhand* v. *Erwin*, 231 Ark. 444, 330 S.W.2d 68 (1959). The amendment met a need which was unforeseen by the drafters of the 1874 Constitution. However, Amendment 49, adopted in 1958, contained the same provision concerning bonds as other constitutional provisions. The voters had to approve such bonds. No sooner than the people authorized "bonds" to be issued to finance industries after a proper vote, the legislature passed Act 9 of 1960 in an extraordinary session. This act called such industrial bonds "revenue" bonds, but an election was required. The purpose of Act 9 was to "implement and supplement the provisions of said Amendment 49 to the end of carrying out the broadest and most aggressive possible industrial development program. . . ." The legislature directed that the act was to be liberally construed. In 1976, by Act 1239, Act 9 was amended to provide industrial "revenue" bonds could be issued *without* an election. No doubt, this legislation was intended to avoid the constitutional provisions pertaining to bonds and financing.

Amendment 49 did not need Act 9 for implementation, but Act 9 needed Amendment 49. *Myhand* v. *Erwin, supra.* Act 9 was essentially approved in *Wayland* v. *Snapp*, 232 Ark. 57, 334 S.W.2d 633 (1960), where a majority of the court looked the other way when the constitution was violated. But *Wayland* cannot be used for a blanket approval of all Act 9 bonds, because just as in *Myhand*, a true Amendment 49

bond issue, there was an overwhelming voter approval.

In 1971, Act 380 was passed. Act 380 is much like Act 9, as amended, in that it allows bonds to be issued by cities and counties without a vote, but expands the word "industry" used in Amendment 49 to include "tourism," a rather nebulous term. At the same time that Act 380 recites it is for the purpose of implementing Amendment 49, it proceeds to violate it. It provides for no vote, states that the bonds are "revenue bonds," increases the thirty year limitation in Amendment 49 to forty years, increases the interest limitations from six percent per annum to no limit and does away with the requirement for public sale of the bonds after advertisement.

This brings us to the case of *Purvis* v. *Hubbell, supra,* and the current case. In review, what we have is a total corruption of Article 16 and Amendments 13, 20 and 49. We cannot and should not ignore the problem any longer. Whatever sound reasons may have existed for approving "revenue bonds" in *Snodgrass,* either no longer exist or should be abandoned if we are to keep the confidence of the taxpayers and the financial integrity of our government.

It is strongly suggested that the bonds in this case pledge no tax or indebtedness of the city, that they are not even revenue bonds, and, therefore, the bonds do not violate any constitutional provision. That is true to a degree. But if the government is not involved in any way, how can it issue bonds? But it is, in this case; the city bought the land with city revenue, or at least city revenues were pledged (that is not clear); the city lent its credit to the bond issue in violation of Article 16. Furthermore, Amendment 49 is not limited to credit lending situations. *Myhand* v. *Erwin, supra.* Act 380 can only be legal if it is in accordance with Amendment 49. It is the sole authority for its existence. The bonds are not legal if Act 380 is not legal, and it is not totally legal.

Actually, the reason for the bonds is more one of greed than public welfare. These are tax free bonds, which are approved by the federal government, and the city is merely being used as a tool to arrange this favorable financing for

purely a private enterprise. The motel owners profit because they get a motel with a favorable financial arrangement; the bond salesmen profit, because they get to sell bonds and get a commission on what would ordinarily be a purely commercial loan situation; and the buyers get a tax-free income. What does the city get? Probably nothing. Should we care since the bonds state on their face that the city is not liable? Should we care about bondholders who would buy such bonds? Should we care because the federal government brought about this creation that deprives itself of income? We should care for two reasons. The city has expended funds in this endeavor by buying the land and incurring the liability of having to take over the motel. More important, we should care because it is illegal. Act 380, which provides for bonds without voter approval, violates Amendment 49 and cannot stand. If it cannot stand, the bonds are void.

The public has never approved of any city, county, or state government issuing revenue bonds. We were the ones that initially approved this practice, and it is now our duty and obligation to prevent its further abuse by enforcing the constitution. Voter approval will harm no one. It will simply restore us to our claimed financial integrity. The warning was clear in *Purvis* v. *Hubbell, supra.* Not only should we strike down this bond issue as being a purely private one, we should place a moratorium on all further revenue bonds and enforce the constitution.

The majority decision will have little or no effect on the general practice of local and state governments incurring debts in avoidance of the constitution, but it is a step in the right direction.

ROBERT H. DUDLEY, Justice, concurring. The various multipartite opinions in this case are evidence of our division over the numerous issues. The majority of the members do not agree with the reasoning expressed in much of the plurality opinion. This concurring opinion is written in order that those interested may determine where the majority lies on the various issues and to state the reasoning which I think is valid.

The bonds issued for the La Quinta Motor Inn and the Kettle restaurant were not issued for a public purpose. "Public purpose" under Amendment 13 was limited to streets, parks, airfields, and similar improvements. It did not include erection of factory buildings for a private corporation. *Williams* v. *Harris, Mayor,* 215 Ark. 928, 224 S.W.2d 9 (1949). Amendment 49 broadened the Amendment 13 definition of "public purpose" by providing, in part: "Any city . . . may issue . . . bonds for the purpose of securing and developing industry." Under this more recent definition we look at the entire undertaking, not just whether the purpose is to construct an improvement which benefits a private corporation, but whether the entire undertaking is to alleviate unemployment. *Wayland* v. *Snapp,* 232 Ark. 57, 334 S.W.2d 633 (1960); *Myhand* v. *Erwin,* 231 Ark. 444, 330 S.W.2d 68 (1959). The term "industry" is used in the context of its broader meaning of providing employment in cooperation with private enterprise. *Hackler* v. *Baker, County Judge,* 233 Ark. 690, 346 S.W.2d 677 (1961).

Legislation may be enacted in implementation of a constitutional provision so long as such legislation is not inconsistent with or repugnant to the constitutional provision. *Myhand* v. *Erwin, supra.* Act 380 of 1971, as codified at Ark. Stat. Ann. § 13-1801 (Repl. 1979), expressly has been found to be a valid implementation of Amendment 49. *Purvis* v. *Hubbell, Mayor,* 273 Ark. 330, 620 S.W.2d 282 (1981). It provides, in part, that tourism is legislatively determined to be an industry. That determination has a rational basis and, as far as I can find, is questioned only by the plurality opinion and the other concurring opinion. Section 2 of the act, Ark. Stat. Ann. § 13-1802 (Repl. 1979), states in pertinent part:

Tourism projects authorized and enumerated. — Any municipality . . . is hereby authorized to own, acquire, construct, . . . sell, lease, contract concerning, or otherwise deal in or dispose of any lands, buildings, . . . or facilities of any and every nature whatever necessary or desirable for the securing and developing of recreation, relaxation, travel, entertainment, cultural

> development and other tourism activities of every nature . . . within or near the municipality . . . including, without limitation, hotels, motels, inns, lodges, folklore facilities, cultural development facilities, convention facilities, restaurants (in connection with other facilities for the securing and development of tourism), parks . . . parking facilities . . . recreation areas and other facilities of any nature whatever that can be used to secure and develop tourism and to thereby stimulate and enhance the economic growth and well-being of the municipality . . . and the people. Any such undertaking, or combination of such undertakings, will be herein sometimes referred to as a "tourism project."

Within the purview of this statute we approved the issuance of municipal revenue bonds for the construction of a hotel in connection with the development of a civic center. *Purvis v. Hubbell, Mayor, supra.* However, the statute does not, and cannot, make every commercial undertaking into an industrial undertaking to eliminate unemployment. In order to fulfill a public purpose, a commercial undertaking must bring about more than a remote or an indirect public benefit. Of course, the motel and restaurant will redound to the public benefit by slightly reducing unemployment, but this is true of any commercial operation. If a slight reduction of unemployment constitutes a public purpose then all commercial enterprises in the state are entitled to a similar bond issue.

The determination of whether a municipal undertaking fulfills a public purpose initially is an executive decision to be made at a local level. A court is hesitant to disagree with that local decision. Accordingly, we will reverse that decision only if the local government acted arbitrarily, unreasonably, or capriciously. *See Purvis v. Hubbell, Mayor, supra.* In this case the Little Rock Board of Directors acted unreasonably.

The motel and restaurant involved in this case are freestanding commercial structures. They do not constitute a functional part of a convention center, a public park, or a

recreational center. The appellees point out that they have been constructed in an area where a city zoo, amusement park, tennis center, golf course, football stadium, baseball stadium, and health care facilities were already in existence. Reasonably close proximity to public institutions does not convert a private commercial enterprise into an undertaking which fulfills a public purpose. The close physical proximity of La Quinta and the Kettle to the public institutions is not of real significance and is not determinative. To illustrate, assume the record contained evidence that a motel and restaurant, named the Markham Inn and the Black Angus restaurant, were located even closer to the same public institutions than are La Quinta and the Kettle. Also, assume that the owners of those establishments wanted the same bond privileges that have been extended to La Quinta and the Kettle and that the city board again approved a bond issue. If these assumed facts were tested in a case, and the appellees' rationale were followed, the bond issue again would be approved. Assume the record contained evidence that two nationally franchised fast food restaurants, such as McDonald's and Wendy's, were also located close by. Could either be distinguished from the Kettle or the Black Angus? Assume a mall, named University Mall, containing many enterprises, was located as close to some of the public facilities as La Quinta. Under appellees' theory each enterprise would be entitled to a bond issue. The same would be true of any enterprise in the state which is located near a courthouse, a post office, a federal building, a park, a football field, or a school. To accept the rationale of the appellees, as the dissenting opinions do, is to accept an arbitrary and unreasonable local governmental decision and to abdicate the responsibility of judicial review.

A majority of the members of this court agree that the bonds for the La Quinta Motor Inn and the Kettle restaurant were not issued for a public purpose. I concur in holding that these bonds are not valid within the purview of Act 380 of 1971.

Unfortunately, the plurality opinion would go much farther and hold that Act 380 of 1971, Ark. Stat. Ann. § 13-1801, "is invalid when it purports to allow bonds to be issued

without an election and for interest in excess of six per cent and the maturity dates beyond thirty years." The plurality opinion would similarly limit bonds issued under Act 9 of 1960, Ark. Stat. Ann. § 13-1601 (Repl. 1979). A majority of the members of this court do not agree with the plurality opinion on this point.

For fifty years this court has held that the Constitution of Arkansas authorizes cities to incur long term debt for the purpose of making authorized improvements for public purposes, without conducting an election, if the debt is to be repaid out of revenue generated by the improvements and the repayment does not place a burden on the taxpayer for which his property might be appropriated.

Amendment 13 contains the following provision on elections, rates of interest and maturity dates on bonds:

> Provided that cities of the first and second class may issue by and with the consent of a majority of the qualified electors of said municipality voting on the question at an election held for the purpose, bonds in sums and for the purpose approved by such majority at such election . . .

> . . .

> No bonds issued under the authority of this amendment shall bear a greater rate of interest than six per cent per annum . . .

> . . .

> No bonds issued under the authority of this amendment shall be issued for a longer period than thirty-five years.

In 1932, in the case of *McCutchen* v. *Siloam Springs*, 185 Ark. 846, 49 S.W.2d 1037, this court held that a city, without an election, under Amendment 13, could incur a debt in excess of its current revenues, payable over a five and one-half year period, to buy machinery for its electric plant,

because money derived from the operation of the plant was not "funds belonging to the city" and could be pledged.

By Act 131 of 1933 the General Assembly authorized municipal waterworks, without an election, to issue bonds to purchase, construct or improve the waterworks system. In *Jernigan* v. *Harris*, 187 Ark. 705, 62 S.W.2d 5 (1933), we upheld the statute and stated: "As to Amendment No. 13, it may be said that it has no application here, as there is no attempt to exercise any of the powers conferred by it."

In the 1934 landmark case of *Snodgrass* v. *Pocahontas*, 189 Ark. 819, 75 S.W.2d 223, the court held that under Amendment 13 elective approval was required if the bonded indebtedness for the municipal improvement would place a burden on the taxpayer, but Act 131 of 1933 provided an alternative method and, under it, an election is not required if the bonded indebtedness is to be repaid solely by revenues from the improvement. We have never deviated from that construction of Amendment 13. *Hogue* v. *The Housing Authority of North Little Rock*, 201 Ark. 263, 144 S.W.2d 49 (1940); and *Boswell* v. *City of Russellville*, 223 Ark. 284, 265 S.W.2d 533 (1954). The plurality opinion expressly reaffirms these cases.

By 1958 this court had held, for over a quarter of a century, that an election is not necessary if the debt was to be repaid solely from revenues from the improvements. At that time it was felt that unemployment could be alleviated through industrial development but, in order to develop industry, it would be necessary to broaden the definition of public purpose contained in Amendment 13. The drafters of the proposed amendment, No. 49, obviously relied on our quarter century of precedent. The voters then approved the amendment. Amendment 49 contains the same three strictures on elections, interest and maturity as were contained in Amendment 13. Some of its language is identical:

> Any city of the first or second class, any incorporated town, and any county, may issue, by and with the consent of the majority of the qualified electors of

said municipality or county voting on the question at an election held for the purpose, bonds in sums approved by such majority at such election. . . .

. . .

Such bonds shall bear interest at a rate not to exceed six percentum per annum. . . .

. . .

. . . No such bonds shall be issued for a period longer than thirty (30) years.

The General Assembly, obviously relying on this court to treat *implementing legislation of Amendment 49* just as we had treated Act 131 of 1933 under Amendment 13, passed Act 9 of 1960, Ark. Stat. Ann. § 13-1601, the Industrial Development Revenue Bond Law, and Act 380 of 1971, Ark. Stat. Ann. § 13-1801, the Tourism Revenue Bond Act.

In *Purvis* v. *Hubbell, Mayor, supra,* we reaffirmed our earlier cases and held the three strictures of Amendment 49, just like the three strictures of Amendment 13, were not applicable *when the bonded indebtedness was to be repaid solely by the revenues from the improvement.* The holding was in accord with the desire of the voters to broaden the scope of Amendment 13 by the adoption of Amendment 49 and was in accord with the reliance placed on our earlier cases.

The plurality opinion reaffirms all of the cases decided under Amendment 13, the old amendment, and then, without stating a reason, without discussing the similarities of the strictures contained in Amendments 13 and 49, and without giving effect to the broadened scope of Amendment 49, would make the three strictures applicable to Amendment 49 bond issues. Thus, the plurality would not require an election under the older and narrower amendment but would require an election under the newer and broader amendment. The plurality opinion would do this even though Amendment 49 constitutionally changes the defi-

nition of purely public purpose to more broadly include "securing and developing industry." The plurality opinion is simply wrong on this point. Our cases constitute a well developed body of precedent, now stretching over half a century, by which this court has consistently interpreted the constitution to authorize governments to incur long term debt, without elective approval, in order to make authorized improvement for public purposes when the debt is to be paid out of revenues.

The plurality opinion and the other concurring opinion, by applying the three strictures, would not only reverse our precedent but would prevent municipalities from issuing industrial bonds or tourism bonds for any of the above purposes until interest rates again fall to six per cent. Again, a majority of the members of this court do not agree with the plurality opinion.

Lastly, a majority of the members of this court do not agree that the facts of this case bring it within the aegis of the caveat expressed in *Purvis*. A majority intend that warning to apply to the expanded concept of "payment solely from revenues" which has been used to retire a bonded indebtedness without elective approval.

RICHARD B. ADKISSON, Chief Justice, dissenting. The issuance of bonds under Amendment 49 contemplates that tax monies will be obligated to retire the indebtedness, and there must be voter approval before issuance. Such was the case in *Purvis* v. *Hubbell, Mayor*, 273 Ark. 330, 620 S.W.2d 282 (1981), but, here, no tax monies are involved. Therefore, voter approval is not necessary. These are strictly revenue bonds to be retired solely from monies generated from the La Quinta Motor Inn project.

I would affirm.

STEELE HAYS, Justice, dissenting. I wholly disagree that the caveat in *Purvis I* was meant to give the warning the majority opinion now says was intended. The court suggests that in *Purvis I* we expressed "serious doubts about bonds

being issued without an election." That is a broadening of what was intended by the *Purvis* caveat. It was not simply the lack of an election which prompted the warning in *Purvis,* it was the fact that bonds unapproved by an election were secured by revenues other than those generated by the convention center complex. No objection was implied in *Purvis I* to the long approved practice of municipalities issuing special obligation bonds without an election where the bonds were to be retired *solely* from revenues generated by the improvement. By this opinion the court has turned back the calendar by several decades, and skirted a good many cases, in its treatment of special obligation bonds. Regrettably, it tries to give credibility to that extraordinary move by relying on the *Purvis* caveat.

In *Purvis I,* we noted that the bonds were to be repaid not simply from the revenues generated by the convention center complex, but from several sources beyond the complex, including state turnback revenues, income from adjacent parking facilities, revenues derived by the city from a tax on gross receipts from hotels, motels, and restaurants, and revenues received by the city from the existing and new convention centers. This multiple financing concept gave the appellant reasonable grounds to argue in *Purvis I* that voter approval of the bonds was required under Amendment 49. And although we rejected that argument in *Purvis I,* the court warned in the caveat that the issue of voter approval was subject to re-examination because of a gradual expansion of the concept of special revenue producing bonds in the fifty years since *Snodgrass* v. *Pocahontas,* 189 Ark. 819, 75 S.W.2d 223 (1934) was decided. In *Snodgrass* we upheld the issuance of revenue bonds by the City of Pocahontas without voter approval because the bonds were to be paid solely from revenues derived from the improvement. *That is precisely the situation here.* These bonds, like those in *Snodgrass* v. *Pocahontas,* are to be paid *solely* from the revenues produced by the facility. The "gradual expansion" referred to in the *Purvis* caveat was intended to bring into question such cases as *Holmes* v. *Cheney,* 234 Ark. 503, 352 S.W.2d 943 (1962); *Mills* v. *Gordon,* 234 Ark. 525, 353 S.W.2d 157 (1962), and *McArthur* v. *Smallwood,* 225 Ark. 328, 281 S.W.2d 428 (1955), where we had approved without an

election, methods for the repayment of bonds from sources of revenue far more extensive than simply derived from the improvement itself. Presumably, that process of expansion reached its outer limit in *Purvis* and, hence, the caveat.

Elsewhere in its opinion the court implies that the *Purvis* caveat is aimed at the public-purpose versus private-purpose issue. That, too, is wrong. The public-purpose issue was dealt with at length at the outset of the *Purvis I* opinion and the private-purpose argument was rejected without the slightest suggestion that we intended to later re-examine that issue.

Nor do I agree that it is our place to conclude that no public purpose is served by this facility. By adopting Act 380 of 1971, the legislature empowered "any municipality or county" to undertake projects which might benefit tourism, a major economic resource to those areas having some appeal to tourists. The City of Little Rock acted pursuant to that legislation and it is not for us to second-guess that decision. We frequently say that whether projects sanctioned by other branches of government are wise and prudent is not ours to judge. *Purvis* v. *Hubbell, supra* and *Miles* v. *Gordon,* 234 Ark. 525, 353 S.W.2d 157 (1962). Nevertheless, the court has substituted its own judgment for that of the Little Rock Board of Directors in determining what benefits tourism and has effectively concluded that accommodations for food and lodging do not. Interestingly enough, this court once recognized the importance of accommodations to tourism in upholding the right of the City of Eureka Springs to tax hotels, motels, and restaurants for the benefit of tourism saying:

> It is common knowledge from time immemorial that the traveler or tourist must first have lodging and food in the area in which he sojourns. *Dicks* v. *Naff, Mayor,* 255 Ark. 357, 500 S.W.2d 350 (1973).

In this case, title to the land and the entire improvement is vested in the City of Little Rock. The La Quinta Motel leases the improvements from the city and will pay to the City of Little Rock $900.00 a year to defray administrative costs and an amount determined by a formula intended to produce

each year what La Quinta would pay in ad valorem and property taxes if it were the owner. Additionally, La Quinta will pay $12,626,000 under the lease to retire the bonds. We have approved bonds in similar projects where public facilities are leased to private operators. See *Wayland* v. *Snapp,* 232 Ark. 57, 334 S.W.2d 633 (1960); *Lambert* v. *Wharf Improvement Dist. No. 1 of Helena,* 174 Ark. 478, 295 S.W. 730 (1927), and in *Purvis* v. *Hubbell, Mayor,* 273 Ark. 330, 620 S.W.2d 282 (1981).

Where in this record (other than by the proffer of excluded testimony) is there any proof to support the conclusion that no public purpose exists? That determination was made by the Little Rock Board of Directors and appellant does not attempt that argument except to submit that a "free-standing" motel does not come within Act 380, urging that it must be functionally a part of an overall tourism project. Yet the majority has overruled the Chancellor and brushed aside with a sentence substantial evidence presented to the trial court that the proposed project was thoroughly examined over an extended period of time by the Board of Directors, including holding public hearings — proof from which the Chancellor found the project promoted tourism. The majority has made no attempt to differentiate between the benefits of the project accruing to the public in contrast to private interests, it has simply concluded without discussion that any public interest is lacking. In so doing it has invaded the province of another branch of government and vetoed the acts of a municipal government wholly without evidence to justify such action.

The fundamental issue of this appeal is not nearly as complicated as the majority opinion would have it seem. It is simply whether or not bonds of limited obligation may be issued without an approving election to construct an improvement which a municipality deems to be in the public interest in promoting tourism. Cases extending over half a century have said again and again that where the general revenues of a city are not pledged, no approving election is required. The bonds in this case can never constitute an indebtedness of the City of Little Rock nor become a liability of its residents. These bonds were issued

on the express proviso that *only* the revenues generated by the development itself are pledged to secure the bonds. Why this court should suddenly see fit to invalidate that time tested method of financing is not apparent.

The decree should be affirmed.

ADKISSON, C.J., and HOLLINGSWORTH, J., join in this opinion.

Supplemental Opinion on Denial of Rehearing
delivered June 4, 1984

669 S.W.2d 900

PER CURIAM, on rehearing. The members of the court, having themselves experienced the difficulties presented by appellate court decisions in which no single opinion expresses the position taken by a majority of the judges, have thought it desirable to issue a supplemental opinion covering a few basic questions as to each of which a majority are in broad agreement, despite a continued adherence to individual views expressed in the five opinions handed down on March 26.

1. The decision in this case, *Purvis II*, does not impair a line of cases typified by *Snodgrass* v. *Pocahontas*, 189 Ark. 819, 75 S.W.2d 223 (1934), holding that when a city or county owns a revenue-producing facility of a genuinely public nature, such as a municipal waterworks, bonds may be issued without an election to obtain funds for the operation or expansion of that public facility, the bonds being payable only from revenues derived from the facility. Justices George Rose Smith, Purtle, Dudley, Hays, and Hollingsworth concur in this view.

2. Although the attraction of tourists may in some situations constitute an industry within Amendment 49, the court is unwilling to attempt to define "tourism" as an industry, beyond the holding in *Purvis II* that a motel such as the La Quinta Inn does not qualify for a tax-exempt bond issue under Amendment 49 and Act 380 of 1971, as amended. Justices George Rose Smith, Hickman, Purtle, and Dudley concur in this view.

3. The argument on rehearing that the court's interpretation of the caveat in *Purvis I* denies due process to La Quinta and its bondholders is rejected, because the inclusion of an express provision in the La Quinta bonds making them callable at a premium if they are held to be taxable and also of a provision that the bonds be secured in addition by a $4,565,625 letter of credit issued by Crocker National Bank makes it obvious that all parties concerned in the La Quinta bond issue realized that the bonds might not be tax exempt. Justices George Rose Smith, Hickman, Purtle, and Dudley concur in this view.

4. The court unanimously declines to issue an advisory opinion by attempting to answer the various questions, going beyond the issues in this case, to which answers are requested by the Attorney General's amicus curiae brief.

Rehearing denied.

Opinion on Disqualification

P. A. HOLLINGSWORTH, Justice. The appellant has

asserted that my participation in this case is a conflict of interest citing Canon 2 and Canon 3 from the Code of Judicial Conduct adopted by this Court by a per curiam on November 5, 1973. After carefully reviewing the canons and issues in this matter, I find no possibility of impropriety or the appearance of impropriety by my participation. Neither do I find that I cannot perform my duties impartially or diligently. I have no financial or other interest in the subject matter in this case. My ownership in a building located in the Metrocenter Improvement District has no connection to this case now before us.