**BANK OF NEW YORK, Plaintiff,**

v.

**UNIVERSITY PARTNERS, LTD., et al., Defendants.**

**Civ. No. 87–5113.**

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Aug. 3, 1989.

Larry W. Burks, William H. Sutton, Meredith P. Catlett, Friday, Eldredge & Clark, Little Rock, Ark., for plaintiff.

George E. Butler, Jr., Boyd D. Cox, Fayetteville, Ark., Douglas P. Ray, Moore & Peterson, Dallas, Tex., William Jackson Butt, II, Davis, Cox & Wright, Fayetteville, Ark., Thomas A. Connop, Locke, Purnell, Rain, Harrell, Joseph J. Leising, Receiver, MHM, Inc., Dallas, Tex., for defendants.

**MEMORANDUM OPINION**

H. FRANKLIN WATERS, Chief Judge.

### I. *Introduction*

Pending before the court are various motions and cross-motions for summary judgment filed by the respective parties. Ultimately at issue is the right of the plaintiff, the Bank of New York (hereafter BONY) to judgment on a note, trust indenture, and loan agreement executed by defendants, University Partners, Ltd. (formerly University Hilton Partners, Ltd.) (hereafter University Partners), Sumner and Greener (a Texas general partnership), and Charles W. Greener and Alan R. Sumner, individually

(hereinafter referred to collectively as Obligors).

The note and debt of the Obligors is secured by a lien on certain real and personal property constituting the Fayetteville Hilton Hotel. The trust indenture is a mortgage and lien on the Fayetteville Hilton. BONY seeks to foreclose on the Fayetteville Hilton pursuant to the terms of the trust indenture.

Defendant, Sunbelt Service Corporation, a Texas corporation (hereafter Sunbelt) and Edward Peterson, trustee, claim an interest in the Fayetteville Hilton pursuant to a deed of trust and a correction deed of trust filed subsequent to the trust indenture in favor of BONY.

Sunbelt disputes BONY's right to foreclose on the property and attacks the validity, priority and superiority of BONY's lien.

## II. *Facts*

The following synopsis of the factual background is taken from the statements of uncontested facts filed by the parties, and the voluminous documentary evidence submitted in support of and in opposition to the various pending motions.

On November 13, 1979, the Board of Directors and Mayor of the City of Fayetteville, Arkansas, passed Resolution No. 110–79, authorizing the execution of a Memorandum of Intent involving the City of Fayetteville and Sumner and Greener, proposing that a hotel be acquired, constructed and equipped for the purpose of developing tourism and economic growth in Fayetteville and adjacent areas.

On April 15, 1980, the Board and Mayor of Fayetteville enacted Ordinance No. 2627, authorizing the issuance of $9,850,000 of "Tourism Revenue Bonds." Ordinance No. 2627 was amended by Ordinance 2770 on November 3, 1981, to provide for the issuance of Tourism Revenue Bonds in a principal amount not to exceed $10,000,000 amending the rate of interest on the bonds to a rate "not to exceed the maximum rate permitted by applicable law at the time of issuance."

On February 24, 1982, University Partners executed and delivered a promissory note in the principal amount of $10,000,000 payable to the order of BONY. The note provides, *inter alia:*

(i) *Interest Rate.* Interest shall be paid at a rate per annum (based on a 360–day year, based on actual days elapsed), equal to 70% of the Prime Rate. "Prime Rate" as used herein shall mean that rate of interest which The Bank of New York announces from time to time at its principal domestic office as its prime rate. The Prime Rate shall change when and as the prime rate of The Bank of New York changes. In no event shall the rate payable on this Note ever be less than 9% per annum or more than 17% per annum.

(ii) Payment Amount and Dates, (a) Interest shall be payable in monthly installments, the first installment shall be payable April 15, 1982, and subsequent installments shall be payable on the same day of each succeeding month until this note is paid in full....

The note was executed by University partners in connection with the issuance of $10,000,000 in bonds by the City of Fayetteville. The interest and payment provisions of the bonds are identical to the terms of the note. Each bond provides:

This Bond is one of an issue of Bonds in the principal amount of $10,000,000 (the "Bonds") issued pursuant to the hereinafter described Act and to a Trust Indenture duly executed and delivered by the Issuer, Greener and Sumner Architects, Inc., a Texas corporation (the "Corporation"), Alan W. Sumner ("Sumner"), Charles R. Greener ("Greener"), Sumner & Greener, a Texas general partnership (the "General Partnership"), and the Borrower (identified below) to the Trustee and The Bank of New York, in its corporate capacity and not as Trustee (the "Bank") (the "Indenture") for the purpose of providing funds to refinance the cost of acquiring, equipment and constructing a certain site and building located thereon together with certain other property in connection therewith constituting tourism facilities (the "Project") and paying expenses incidental thereto,

to the end that the Issuer may be able to promote the economic and general welfare within the City of Fayetteville, Arkansas....

As indicated, the bonds and the note are secured by the aforementioned Trust Indenture encumbering the Fayetteville Hilton. The Trust Indenture was filed for record on March 2, 1982. The loan agreement is dated January 1, 1982. The note is dated February 24, 1982.

The proceeds from the sale of the bonds were loaned to the Obligors under the note, Trust Indenture, and loan agreement as part of the financing for the construction of the Fayetteville Hilton. A Deed of Trust encumbering the property in favor of Sunbelt was filed for record on November 1, 1984, and a Correction Deed of Trust was filed on November 4, 1985. The Deed of Trust evidenced an agreement between University Partners and Sunbelt as part of University Partners' overall financing package.

Proceeds of the bonds in the amount of $9,709,557 were applied on March 4, 1982, to an interim construction loan issued by BONY. After application of the bond proceeds, in addition to the bond obligation of $9,709,557 there remained owing on the construction loan the sum of $283,925 plus construction interest of $692,904.

BONY initiated this foreclosure action on September 3, 1987, claiming a prior and superior lien on the Fayetteville Hilton. In the amended answer of Sunbelt and Peterson, these parties alleged that the bond issue was invalid, and therefore that BONY's mortgage was also not valid, making Sunbelt the superior lien holder. Additionally, Sunbelt alleged that the BONY debt was usurious, that the statute of limitations prevents BONY from maintaining an action against the Obligors, and that, as a result Sunbelt and Peterson may pursue any of their remedies unimpeded by any claim of BONY.

BONY subsequently filed a motion for Summary judgment and Sunbelt timely responded and filed a cross-motion for summary judgment. The issues have been fully briefed by the parties and the court is prepared to dispose of these motions.

### III. *Discussion*

The first issues that must be addressed is whether Sunbelt and Peterson have standing to challenge the validity of the bonds and whether the validity of the bonds is relevant to the validity of the Obligors debt to BONY.

#### (a) Standing.

BONY argues that Sunbelt and Peterson have standing to raise the issue of the validity of the bonds only as authorized by Article 16, § 13 of the Arkansas Constitution, which authorizes any citizen of a county, city, or town to challenge the enforcement of an "illegal exaction." BONY asserts that because no tax will be paid as a result of the bonds and because Sunbelt and Peterson are not citizens of Fayetteville, neither Sunbelt nor Peterson may challenge the validity of the bonds under Article 16, § 13.

Sunbelt and Peterson, in response, contend that BONY's "illegal exaction" argument is a smokescreen and that Sunbelt and Peterson have standing in this case by virtue of their status as a junior lienholder. Sunbelt and Peterson cite three Arkansas cases on this point. In *Potter by Redden v. 1st National Bank*, 292 Ark. 74, 728 S.W.2d 167 (1987), the Arkansas Supreme Court indicated that issues of standing are not to be narrowly or restrictively resolved. Other than that general rule of limited utility, *Potter* is not enlightening.

In *Woods v. Bournes*, 228 Ark. 540, 309 S.W.2d 309 (1958), the Arkansas Supreme Court quoted from 59 C.J.S., "Mortgages", § 146, as follows:

The right to contest the validity of a mortgage by way of defense or affirmative attack belongs not only to the mortgagor and those claiming under him, but also to third persons whose rights or interests are injuriously affected by the mortgage, such as junior mortgagees, or other creditors whose rights or interests are injuriously affected by an invalid mortgage.

The facts in *Woods* are particularly unlike those presented here. In *Woods,* Woods sold a tractor to Bournes for $1250. Bournes executed two notes in that amount payable to Woods. One note was signed only by Augustine Bournes. The other was signed by Augustine and Hazel Bournes and was secured by a mortgage on 100 acres of land. There was only one debt of $1250.00. Augustine Bournes died and Woods filed suit to foreclose the mortgage on the land naming Hazel Bournes and the administrator and heirs of Augustine Bournes as defendants, as well as Dismang, a purchaser of the land from James Bournes who also held a mortgage on the land and who had foreclosed without making Woods a party.

After the notes and mortgage in favor of Woods were executed, Woods repossessed the tractor. In Woods' suit, all defendants contended that, in repossessing the tractor, Woods had cancelled the original debt with the result that there was no debt to be secured by the mortgage. The trial court held that the debt was cancelled. On appeal by Woods, the Supreme Court agreed with the trial court that Woods had cancelled the debt before he filed suit to foreclose the mortgage. James Bournes and Dismang argued that the underlying debt had been paid. The Supreme Court held that James Bournes and Dismang could raise the previous satisfaction of the underlying debt as a defense to Woods' foreclosure suit.

It is readily apparent that the Supreme Court merely held that one mortgagee could raise the fact that a debt secured by another mortgage had been satisfied and that the latter mortgage could not, obviously be foreclosed because no debt was owed that mortgagee. The Supreme Court did not hold that the Woods mortgage was invalid, nor that other claimants to the land could argue the invalidity of the Woods mortgage. It merely held that a mortgagee who has been paid cannot foreclose on a mortgage, *see Ford v. Nesbitt,* 72 Ark. 267, 79 S.W. 793 (1904); *Ellis v. Jones,* 223 Ark. 681, 267 S.W.2d 955 (1954), and that other claimants to the property adversely affected by a proposed foreclosure by another mortgagee may raise the fact that there is no debt underlying the mortgage upon which suit is brought. It was assumed in *Woods,* that the Woods mortgage was valid. The barrier to foreclosure was that Woods' debt had been paid.

It requires a significant leap in logic to posit that *Woods* stands for the rule that any claimant to property may raise the invalidity of a prior mortgage of which the claimant had notice before the claimant acquired any interest in the property, particularly where continued existence of the original debt is not disputed. Further, the court doubts that, in this case, Sunbelt and Peterson qualify as being "injuriously affected" by the prior mortgage to BONY. Sunbelt and Peterson knew of the prior BONY mortgage at the time University Partners executed the Deed of Trust and Correction Deed of Trust in their favor. Should Sunbelt and Peterson fail in their attempt to have the prior, superior lien of BONY set aside, it nonetheless would not be "injuriously affected," because Sunbelt and Peterson would still have exactly what they "thought" they had from the inception, *i.e.* alien subordinate and inferior to that of BONY.

In *Woods,* however, the decision does not reflect whether the *Woods* mortgage or the James Bournes' mortgage was superior. It is clear that Dismang would have been dispossessed of the property had Woods prevailed, and without any question would have been "injuriously affected." Even if Dismang and James Bournes had held an inferior claim to the property, the Supreme Court merely held that Woods cannot recover twice on the same debt at their expense.

In the instant case, it is beyond question that Sunbelt and Peterson knew and intended that their lien on the Fayetteville Hilton was to be subordinate to that of BONY. The Trust Indenture filed for record on March 2, 1982, states that the borrower (*i.e.* University Partners) will not directly or indirectly encumber the property without the prior written consent of BONY. No consent was requested of or given by BONY to University Partners,

Sunbelt, or Peterson. Additionally, this case presents no issue of "double-satisfaction" of one debt at the expense of other claimants, as was the case in *Woods*. Thus, the actual holding of *Woods* is not applicable to this case.

Sunbelt and Peterson also refer the court to *Billingsley v. Pruitt*, 226 Ark. 577, 291 S.W.2d 498 (1956). In *Billingsley*, the Supreme Court indicated that where a mortgage debt has not been kept alive by payments, the right to foreclose is barred to all parties, even those who are not strangers to the transaction, and subordinate lienholders may raise the issue. However, in *Billingsley*, as in *Woods*, the underlying debt had been extinguished, in *Billingsley* as a result of the operation of the statute of limitations, ("the debt was not kept alive by payments," *Billingsley* at 578–79, 291 S.W.2d 498), and in *Woods* by satisfaction of the debt. In other words, there was no longer any debt. *Billingsley* is clearly not authority for the proposition that a junior lienholder who acquires an interest in property with notice of a prior and superior mortgage may assert the illegality of the prior mortgage from its inception where the debt is still "alive."

Assuming for the moment that the BONY debt is still alive, none of the cases cited by Sunbelt, and Peterson suggest that they have standing to argue the illegality of the BONY mortgage. However, because of the court's disposition of the next issue, it is not necessary for the court to definitively resolve the standing issue.

(b) Whether the validity of the bond issue is relevant to the Obligor's debt and the BONY mortgage.

Sunbelt and Peterson argue that the bonds are invalid under *Purvis v. City of Little Rock*, 282 Ark. 102, 667 S.W.2d 936 (1984). In *Purvis*, five Justices held that only pure revenue bonds could be issued by a city without an election, and only for purely essential public purposes. Sunbelt and Peterson admit that since the bonds were to be repaid exclusively from the revenues generated by the Fayetteville Hilton, they may qualify as pure revenue bonds, but because they were issued to facilitate a private lending arrangement, the bond issue was not for a purely essential public purpose and is, thus, invalid under *Purvis*.

For purposes of this discussion, the court will assume the bond issue to be invalid and that Sunbelt and Peterson have standing to raise the issue.

Review of Arkansas case law reveals no case directly on point regarding the validity of a debt evidenced by a note and mortgage when proceeds from an illegal bond issue form part of the consideration of the transaction. Sunbelt and Peterson refer the court to numerous cases from other jurisdictions. Each of the cited cases stand for the general rule that an illegal agreement or agreement violative of public policy cannot be enforced. *See Groening v. Nowlen*, 369 Mich. 28, 118 N.W.2d 998 (1963) (contract and mortgage in return for a promise that mortgagor would not be prosecuted); *Whitlock v. Creswell*, 190 S.C. 314, 2 S.E.2d 838 (1939) (note and deed of trust given under duress and undue influence to avoid criminal prosecution); *Brewer v. Home Owners Auto Finance Co.*, 10 Cal.App.3d 337, 89 Cal.Rptr. 231 (1970) (deed of trust to land given by automobile purchaser violated California statute); *Amsterdam Lumber, Inc. v. Dyksterhouse*, 179 Mont. 133, 586 P.2d 705 (1978) (trust indenture violated Montana Small Tract Financing Act); *May v. Whitbeck*, 111 Mont. 568, 113 P.2d 332 (1941) (note and mortgage violated Federal Emergency Farm Mortgage Act of 1933); *Kokernot v. Gilstrap*, 143 Tex. 595, 187 S.W.2d 368 (1945) (note and mortgage unenforceable due to underlying misrepresentations and violations of FHA regulations).

██ These cases indicate that if the note and trust indenture violate public policy, are tainted by fraud, or are prohibited by law, they are unenforceable. BONY argues, however, that even if there is some infirmity with the bond issue, the note and mortgage executed by the Obligors are valid and enforceable. BONY directs the court's attention to *Harnwell v. White*, 115 Ark. 88, 171 S.W. 108 (1914). In *Harnwell*, improvement districts were formed to construct road improvements. The members

of the improvement districts were the property owners located within the improvement districts. Municipal bonds were issued to pay for the improvements and the property owners were subject to assessments accompanied by liens on their property to pay for the bonds. The property owners executed a separate agreement obligating the owners to pay any deficiency of funds not received from the assessments, and creating a lien on the lands of the owners for such deficiency. Harnwell, a property owner, challenged the validity of the improvement districts and sought to be relieved of her debt to pay for the bonds. The Supreme Court held that although the improvement districts were not validly created, the property owners, by entering into the separate agreement, were estopped to deny the validity of the improvement districts and that the separate agreements could be enforced.

Obviously, *Harnwell*, is not directly on point, for in the instant action it is Sunbelt and Peterson who raise the validity of the bond issue, not the Obligors. However, *Harnwell* does indicate that the illegality of the bond issue does not, *ipso facto* render the trust indenture unenforceable. It would be anomalous for the principal Obligors to be estopped from raising as a defense the invalidity of the municipal action, but for a court to allow a subsequent, inferior lienholder who had notice of the pre-existing note and mortgage to raise the invalidity, in an effort to acquire a greater interest in the property than was granted to the subsequent lienholder in the first instance.

The debt upon which BONY brings suit was created by the note. The security upon which BONY seeks to foreclose is the mortgage. These two instruments, termed the Trust Indenture, created the debt and security at issue here. The court is not asked to decide whether the City of Fayetteville, or anyone else, must honor the bonds. The court is asked to determine BONY's right to collect a debt created by a separate instrument and to foreclose on a separate mortgage. The debt at issue arises by virtue of the note, and unless the note is invalid, the debt is enforceable, regardless of the validity of the bonds.

Sunbelt and Peterson have failed to demonstrate persuasive reasons to hold the Trust Indenture invalid, simply because the bonds may be invalid. None of the cases to which the court has been referred so hold, and *Harnwell*, though limited in scope, is a clear indication that the Trust Indenture is not necessarily invalid simply because the bond issue may be.

The court concludes that even if Sunbelt and Peterson have standing to raise the issue, the asserted invalidity of the bonds is immaterial to the enforceability of BONY's separate note and mortgage.

Sunbelt and Peterson raise two other affirmative defenses to BONY's foreclosure action: usury and statute of limitations. These issues will be addressed in turn.

(c) Whether the note of the Obligors and the bonds were usurious under Arkansas law.

■ Sunbelt contends that the note of the Obligors and the related bonds prescribed rates of interest which are usurious under Article 19, § 13 of the Arkansas Constitution, subsequently repealed. Article 19, § 13 provided that all contracts prescribing a rate of interest in excess of 10% per annum shall be void as to principal and interest. It is clear that the rates of interest prescribed by the note and bonds exceed 10% *per annum*. However, the Depository Institution's Deregulation and Monetary Control Act of 1980, as amended (DIDMCA) preempted the Arkansas usury provision for loans made during the period from April 1, 1980, through April 1, 1983, or such earlier date as Arkansas adopted a law exempting itself from the provisions of the DIDMCA.

§ 511 of DIDMCA provides a maximum interest rate of five per cent in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve Bank in the Federal Reserve District where the lender is located. The note, bonds, loan agreement, and Trust Indenture, closed as of March 1, 1982, provided for an interest rate to be charged to University partners to be calculated to be a rate per annum

(based on a three hundred sixty-day year based on actual days elapsed) equal to seventy percent of the BONY prime rate, but not to exceed seventeen percent and not to be less than nine percent.

BONY admits that the interest rate on the debt exceeded ten percent. Sunbelt and Peterson calculate that any time the BONY prime rate exceeded 14.09 percent per annum, the note and bonds were usurious under Article 19, § 13 of the Arkansas Constitution. The documentary materials submitted reflect that the BONY prime rate did not dip below 14.09 percent until August, 1982.

Sunbelt and Peterson argue that the debt does not fall within the DIDMCA exemption, citing *Worthen v. Dillard,* 275 Ark. 132, 628 S.W.2d 7 (1982). In *Worthen,* taxpayers challenged the issuance of hospital revenue bonds by Baxter County, Arkansas for the purpose of upgrading and expanding Baxter General Hospital. The bonds required an interest rate in excess of ten percent per annum for the years 1988 to 2011.

Appellees in *Worthen* argued that DIDMCA preempted the Arkansas usury limit. Although the trial court agreed, the Supreme Court reversed holding that the loan evidenced by the bonds was not a "business loan" within the meaning of the DIDMCA.

Sunbelt and Peterson argue that BONY is "hoisted by its own petard," *i.e.,* that BONY, in arguing that the loan was made for public purposes, in an attempt to sustain the validity of the bonds, cannot also argue that the loan was a "business loan" in order to avoid the usury issue.

The court does not believe that it is necessarily logically impossible for a loan to qualify as a "business loan" under DIDMCA and simultaneously constitute a financing for a "public purpose" for purposes of bond-validity analysis under Arkansas law. However, a discussion of this point would necessarily involve an esoteric discourse regarding the tortured history of Arkansas' municipal bond litigation, which is unnecessary at this point. To the extent that BONY wishes to assert arguably inconsistent positions, BONY is entitled to do so. Even if the "public purposes" mentioned in Arkansas' bond decisions is inherently inconsistent with the concept of a "business loan" under DIDMCA, this would merely prevent the court from finding both present in any particular case—it certainly does not preclude a party from advancing favorable argument on each issue.

In any event, the *Worthen* case merely held that "a loan to upgrade a county owned and operated hospital is not within the plain meaning of the term, 'business loan' as used in (DIDMCA)." Obviously, *Worthen* involved a completely different factual scenario than is presented here. Further, the Arkansas Supreme Court's interpretation of provisions of DIDMCA, a federal statute, is not binding on this court. *See Hawkman v. Parratt,* 661 F.2d 1161 (8th Cir.1981); *Wolfs v. Britton,* 509 F.2d 304 (8th Cir.1975).

In this case, once the platitudes and "legalese" are exorcised from the note, bonds, loan agreement and Trust Indenture, it becomes clear that the purpose for which the Obligors incurred the debt with BONY was to finance the construction of the Fayetteville Hilton which was to be operated under a franchise agreement with Hilton Inns, Inc. Sumner and Greener were extensively involved in real estate development and operations involving hotels, motels, office building, condominiums and apartment complexes throughout the southern United States, extensively borrowing from Sunbelt in connection with real estate development. The bonds, note, loan agreement, and Trust Indenture were to be repaid from the revenues of the Fayetteville Hilton and the assets and earnings of the Obligors, while the City of Fayetteville was and is without any monetary liability. Other than the fact that municipal bonds were involved, the transaction does not differ significantly from those involving any other commercial or business enterprise relying solely on private funding.

The term, "business loan" is not defined by DIDMCA. Under any commonly accepted definition of the term, however, it appears that a loan of approximately $10,-

000,000 to finance the construction of a hotel, to be repaid from the earnings of that hotel which is privately owned and operated for profit, would fall within the scope of "business loan." If the bond issue had not been employed as a financing device in this case and private funding were, instead, utilized, it is doubtful that anyone would seriously argue that the loan would not constitute a business loan.

Thus, the question is whether a business loan loses its character as a "business loan" merely because bond proceeds are involved. The answer is obviously that although some ventures financed with "bond money" are not "business loans" under DICMCA, some clearly are. This one is.

Therefore, the maximum interest rate allowable at the time of the time of the execution and closing of the note, bonds, loan agreement, and Trust Indenture was established by DIDMCA. On March 1, 1982, the discount rate in the New York Federal Reserve District was twelve percent *per annum*. Consequently, the maximum rate of interest which could be charged was seventeen percent. On February 23, 1982, BONY set its prime rate at sixteen and one-half percent, which was BONY's prime rate on March 1, 1982. Per the terms of the note, bonds, loan agreement, and Trust Indenture, the interest rate was seventy percent of the BONY prime rate, or an approximate interest rate of 11.71 percent, substantially less than the 17 percent limit. The actual rate charged on the debt has always been less than 17 percent. Accordingly, the debt is not usurious.

(d) Whether the statute of limitations bars BONY's claim in favor of Sunbelt and Peterson.

It is clear that BONY's action to foreclose the lien created by the Trust Indenture is governed by a five-year statute of limitations. Ark.Code Ann. § 16–56–111. Sunbelt and Peterson assert that, inasmuch as this action was commenced on September 3, 1987, BONY's claim is barred if the statute of limitations began running any time prior to September 3, 1982.

These defendants argue that default on the first payment occurred on April 15, 1982. Only $9,709,557 in bond proceeds were credited against the construction loan as of that date. Due and unpaid at that time was $283,925.60 in principal and $692,904.08 in interest on the construction loan.[1]

BONY argues that University Partners made partial payments on the debt, thereby tolling the statute of limitations. *See Connelly v. Hoffman*, 184 Ark. 497, 42 S.W.2d 985 (1931). In this regard Ark.Code Ann. § 18–49–101 provides:

(b) when any payment is made on any existing indebtedness, before it is barred by the statute of limitations the payment shall not operate to revive the debts or to extend the statute of limitations, with reference thereto, so far as it affects the rights of ... third parties, unless the mortgagee ... shall, prior to the expiration of the statute of limitation execute, acknowledge and record a written instrument reflecting the amount and date of payments made or shall endorse a memorandum of the payment with the date thereof on the margin of the record where the instrument is recorded....

Sunbelt and Peterson contend that they are "third-parties" to the BONY–Obligor debt, and as such fall within the "stranger to the transaction" rule. *See Hamburg Bank v. Zimmerman*, 196 Ark. 849, 120 S.W.2d 380 (1938).

BONY has submitted documents reflecting that the first payments of principal on the debt began on February 15, 1985. On July 9, 1982, University Partners established a depository account with BONY and deposited $450,000 used to pay interest on the note and bonds through December of 1982. Beginning in December of 1982 and thereafter, BONY loaned money to University Partners through the depository account to pay interest and principal on the note and bonds until January of 1987.

*Connelly v. Hoffman*, 184 Ark. 497, 42 S.W.2d 985 (1931) is instructive. In that

---

1. BONY's claim recap lists $282,861.24 in unpaid principal of the construction portion of the loan and at least $196,276.55 in interest relating to the principal.

case, one Huggler gave Connelly two promissory notes for $500.00 each, one due April 1, 1923, and one due April 1, 1924, with interest payable annually. Huggler also delivered a mortgage securing payment of the notes. In 1927, Huggler executed a promissory note and mortgage in favor of Wilson, neither mentioning the prior Connelly mortgage. Wilson later assigned the mortgage to Hoffman. Huggler defaulted and Hoffman brought an action for foreclosure in 1930. Hoffman contended that Connelly's interest in the property was barred by the statute of limitations. The Supreme Court held:

> An acknowledgment of the past-due debt and agreement to pay by the mortgager either before or after the statutory bar, constitutes a new point from which the statute begins to run as between the parties, just as a payment made upon the debt foes, but unless the agreement for extension or the payment is endorsed on the margin of the record it cannot affect third-parties who have not in some manner recognized the validity of the prior mortgage.

■ BONY argues that Sunbelt and Peterson do not qualify as "strangers" to the BONY–University Partners debt. The Trust Indenture and the bond transcript filed for record specifically state that no further mortgages could be placed on the property without BONY's consent. Additionally, Sunbelt served as University Partners' primary lender and was intimately familiar with its business transactions, including its dealings with BONY. For Sunbelt to contend that it was completely unaware of the prior mortgage simply cannot be substantiated.

Whether or not this renders Sunbelt and Peterson "strangers" to the BONY–University Partners transaction, the law is clear that when recovery is sought on an obligation payable in installments, the statute of limitations runs against each installment. In *Linke v. Kirk,* 204 Ark. 393, 162 S.W.2d 39 (1942), McCord executed a promissory note for $300,00, payable in six annual installments of $50.00 each, the first installment due October 24, 1930, and the

remaining installments becoming due on October 24 of each succeeding year, the last installment being due October 24, 1935. No payments were made on the note and the holder of the note filed a foreclosure suit in October 1940. The Arkansas Supreme Court held:

> In an action upon a note and to foreclose a mortgage, the five year statute of limitation is applicable.... In the instant case, the first five annual installments were clearly barred by the statute of limitation, they having become due on the 24th day of October in 1930, 1931, 1932, 1933 and 1934.

Quoting from 34 Am.Jur. § 142, the Court stated:

> The rule is firmly established that when recovery is sought on an obligation payable in installments the statute of limitations runs against each installment from the time it becomes due; that is, from the time when an action might be brought to recover it.

Thus, even if Sunbelt and Peterson qualify as "strangers" to the transaction, which proposition is questionable, it is only those payments remaining unpaid which were due prior to September 3, 1982, against which the statute has run. The documents reflect that in July, 1982, University Partners paid interest through December of 1982 and beginning in December, 1982, BONY loaned money to University Partners through the depository account to pay interest and principal until January, 1987. BONY contends that there was no monetary default on or before September 3, 1982, and thus the action is timely. The court agrees. Even if Sunbelt qualifies as a "third party," it is noted that the payments from or on behalf of University Partners "tolled" the statute of limitations, a position contrary to § 18–49–101, but that the statute did not begin to run until an installment became due and unpaid. Sunbelt and Peterson assert that University Partners has been in partial default since March 4, 1982. This is after the documents were filed of record in Washington County. At the same time, however, these defen-

dants admit that the first payment was due under the note on April 15, 1982.

Although it is the court's holding that Sunbelt and Peterson do not qualify as "strangers to the transaction" because of their extensive and intimate knowledge and involvement with University Partners, even if these defendants could raise the statute as a bar, an action would be prohibited only with regard to obligations which were due and in default as of September 3, 1982. Although this may or may not be a significant sum of money, it is unnecessary for the court to resolve whether and in what sum the Obligors were in default on that date, because Sunbelt and Peterson were fully aware of and extensively involved in the financial affairs of University Partners at the time of the execution of the Deed of Trust and Correction Deed of Trust which form the basis of their claim to the property. Obviously, a subsequent mortgagee can be a "stranger to the transaction" in most cases. However, in the instant case, application of such a rule would create a windfall for Sunbelt. The rationale of the "stranger to the transaction" rule is to protect a subsequent mortgagee from being adversely affected by actions of other parties of which he had no notice, not to allow a subsequent mortgagee with notice of the pre-existing mortgage and extensive involvement in the affairs of the debtor to obtain a greater interest in the mortgaged property than was contemplated. As stated in *Billingsley:*

> It is apparent that if the appellant's argument were accepted it would follow that a mortgage, barred both of record and in fact for fifty years or more, could still be foreclosed, with the mortgagor's consent, as against subsequent purchasers for value. Needless to say, that is not the law in Arkansas.

Obviously, the situation in this case presents a far different factual situation, substantially altering the equities. Sunbelt is not a "subsequent purchaser for value." BONY's mortgage is not barred in fact and of record. Sunbelt will not be dispossessed of the property; it will merely be relegated to the status of a junior lienholder which is the status that it bargained for. *See*, by contrast, *McFaddin v. Bell,* 168 Ark. 826, 272 S.W. 62 (1925); *Less v. Manning,* 202 Ark. 138, 149 S.W.2d 40 (1941); *Henry v. Coe,* 200 Ark. 44, 137 S.W.2d 897 (1940). These cases suggest that a "third party" is not entitled to plead the statute of limitations on behalf of the debtor, but is entitled to rely on § 18–49–101. § 18–49–101 protects only third-party purchasers for value whose rights are adversely affected by the failure of the first mortgagee to record a written instrument of payment. Sunbelt and Peterson are not "adversely affected" because they are not deprived of any interest in the property to which they had a right to believe they had acquired at the time of the subsequent mortgage. Sunbelt and Peterson are not "third parties" merely by virtue of their not being a party to the original mortgage.

Accordingly, the court concludes that BONY's debt and right to foreclose is not bared by the statute of limitations.

### Conclusion

BONY is entitled to summary judgment on the issue of liability and its right to foreclose on the property known as the Fayetteville Hilton. From the voluminous materials submitted it appears that the exact amount due under the mortgage and note is disputed and that there is a genuine issue of fact as to that question. Unless the parties are able to stipulate as to this amount, or agree to submit the issue to the court for resolution *de novo* on stipulated facts, the court will schedule a hearing to determine the amount of the debt remaining unpaid. Counsel are directed to inform the court of their intentions in this regard within ten days.

A separate order will accompany this memorandum opinion effectuating the foregoing.